ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EMMA AROCHO PIRRIS<br><br>Apelante<br><br>v.<br><br>BENIGNO DOMÍNGUEZ LARA Y FULANA DE TAL Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTAS POR AMBOS; DALP CORPORATION; MENGANO DE TAL Y JUAN DEL PUEBLO<br><br>Apelados | KLAN202300906 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Caguas<br><br>Caso Núm.:<br>E AC 2016-0177<br><br>Sobre:<br>Acción civil directa de accionista de conformidad con Ley de Corporaciones de Puerto Rico y Código Civil de Puerto Rico y Acción Derivativa |

Panel integrado por su presidenta, la Jueza Rivera Marchand, el Juez Rodríguez Flores y el Juez Campos Pérez.[1]

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de octubre de 2024.

Comparece la parte demandante y apelante, Sra. Emma Arocho Pirris (señora Arocho Pirris) y nos solicita la revocación de la *Sentencia* emitida el 27 de agosto de 2023, notificada el 13 de septiembre de 2023, por el Tribunal de Primera Instancia, Sala de Caguas (TPI). En el aludido dictamen, el TPI declaró *No Ha Lugar* la reclamación civil instada por la demandante; *Con Lugar* la *Reconvención* y la *Reconvención Enmendada* del demandado y apelado, Sr. Benigno Domínguez Lara (señor Domínguez Lara). En consecuencia, ordenó a la señora Arocho Pirris a pagar $104,000.00 a favor del demandado, por la participación de éste en la operación de la Farmacia Domínguez en común, previo a organizarse DALP Corporation (DALP). Además, a petición de parte y según lo estipulado en la *Sentencia* de divorcio de los litigantes, el TPI concedió la liquidación de DALP. Primero, dispuso de un plazo de

---

[1] Mediante Orden Administrativa OATA-2023-212 de 6 de diciembre de 2023 se designa al Hon. José Ignacio Campos Pérez, en sustitución de la Hon. Sol de Borinquen Cintrón Cintrón.

Número Identificador

SEN2024 _____

ciento ochenta (180) días para realizar las gestiones conducentes a la venta de la Farmacia Domínguez. Transcurrido el término sin que se haya podido realizar la venta, a solicitud de parte, el TPI procederá a ordenar la venta de todos los activos de DALP, el pago de las deudas y la distribución equitativa del sobrante neto.

Por los fundamentos que expondremos a continuación, acordamos modificar la *Sentencia* impugnada, a los únicos efectos de reducir a $52,000.00 la suma que la señora Arocho Pirris debe pagar al señor Domínguez Lara; así modificada, se confirma.

**I.**

La presente causa se inició el 27 de junio de 2016, ocasión en que la señora Arocho Pirris presentó una *Demanda* al amparo de Ley General de Corporaciones, *infra*, en contra del señor Domínguez Lara, DALP Corporation y otros demandados con nombres desconocidos.[2] En esencia, alegó que era farmacéutica y que junto al demandado fungían como dueños en un cincuenta por ciento (50%) de las acciones de DALP Corporation. DALP fue incorporada el 14 de mayo de 2010 en el Departamento de Estado, mientras ambas partes aún permanecían casadas. Explicó que la corporación tenía como único activo a la Farmacia Domínguez.

En la *Demanda,* la señora Arocho Pirris adujo que el demandado se arrogó los puestos de presidente, secretario y tesorero y era quien controlaba la administración de DALP, así como que éste estaba incumpliendo con su deber de citar a reuniones y mantener la documentación requerida por la ley y por los estatutos corporativos. Afirmó que estaba impedida de conocer la situación financiera de DALP, privada de la toma de decisiones incumbentes al ente jurídico y vedada de retirar fondos de la cuenta de cheques de DALP. A raíz de los actos atribuidos al peticionario y sus

---

[2] Apéndice, págs. 25-30. La señora Arocho Pirris no incluyó los anejos que menciona en la *Demanda.*

presuntos incumplimientos, la recurrida reclamó una compensación no menor de $200,000.00 por concepto de los daños sufridos. De igual manera, solicitó que se nombrara a un director provisional, conforme la Ley General de Corporaciones, *infra*, y un perito independiente que le otorgara la correspondiente valoración a DALP para la venta de los activos y su eventual disolución. Por último, peticionó que se emitiera una orden de carácter urgente para que el demandado se abstuviera de continuar incurriendo en acciones unilaterales.

El señor Domínguez Lara instó una *Contestación a Demanda y Reconvención*.[3] En síntesis, negó las alegaciones de incumplimientos y daños presentados en su contra. Afirmó que la demandante siempre ha tenido voz en la toma de decisiones y acceso a la situación financiera a través de la contadora pública autorizada (CPA) de DALP. Expuso que la conducta hostil de la demandante había provocado los problemas de comunicación, a pesar de tener tres hijas en común. Acotó, pues, que los daños reclamados eran inexistentes y autoinfligidos. En la *Reconvención*, el demandado abogó para dar cumplimiento a la *Sentencia* de divorcio, fechada el 13 de marzo de 2013.[4] En el aludido dictamen, ambas partes se obligaron a vender la Farmacia Domínguez en común y que, luego de satisfacer las deudas, el sobrante sería dividido en partes iguales. Sostuvo que la señora Arocho Pirris, en contravención a lo pactado, había impedido la venta del negocio a terceros. Manifestó que la reclamación de autos tenía el fin de mantener la indivisión de la comunidad postganancial. Además, solicitó el pago de $104,000.00 por concepto del remanente de la Farmacia Domínguez cuando fungía como un DBA, siglas en inglés de "doing business as". Indicó que la suma dineraria era retenida por la señora Arocho Pirris.

---

[3] Apéndice, págs. 31-39.
[4] Caso Núm. EDI 2012-1457.

Peticionó también una cantidad no menor de $500,000.00 por los daños económicos y emocionales que la demandante le ha causado con su actitud hostil y temeraria.

La señora Arocho Pirris replicó.[5] En esencia, reiteró sus previas reclamaciones. Con relación a los $104,000.00 negó que en la *Sentencia* de divorcio se acordara el pago de suma alguna a favor del demandado.

Posteriormente, la demandante presentó una *Demanda Enmendada* con el propósito de añadir una acción derivativa.[6] Explicó que, a principios de mayo de 2018, el demandado estableció una farmacia llamada Mi Farmacia Domínguez y Mucho Más, cerca de la original. Adujo que el demandado utilizó información privilegiada y quebrantó el deber de lealtad hacia DALP. Indicó que la similitud del nombre causaba confusión a la clientela y afectaba el valor del negocio. A esos efectos, argumentó que, como accionista y director de DALP, el demandado violó varios artículos de la Ley General de Corporaciones, *infra*. Por igual, solicitó que, conforme con el estatuto se ordenara el pago adelantado de los gastos incurridos como oficial y accionista al tener que presentar la acción derivativa; y peticionó el resarcimiento en daños y perjuicios por el alegado quebranto del deber de fiducia por parte del señor Domínguez Lara. Del mismo modo, reclamó un pago retroactivo a diciembre de 2016 ascendente a unos $100,000.00 por los salarios dejados de devengar como farmacéutica regente y empleada de la Farmacia Domínguez.

El señor Domínguez Lara presentó una *Contestación a la Demanda Enmendada, Reconvención Enmendada*.[7] Además de reproducir sus alegaciones responsivas previas, expuso que Mi

---

[5] Apéndice, págs. 40-43.
[6] Apéndice, págs. 44-51.
[7] Apéndice, págs. 52-59.

Farmacia Domínguez y Mucho Más pertenecía a una corporación llamada Latitud 18 Norte, LLC y que el permiso expedido fue a nombre de la referida entidad. De igual forma, reiteró que, de conformidad con la *Sentencia* de divorcio de las partes y el *impasse* entre los accionistas, procedía la disolución de DALP al amparo del Artículo 9.03 de la Ley General de Corporaciones, *infra.*

En respuesta, la señora Arocho Pirris incoó una *Réplica a Reconvención.*[8] Si bien aceptó la disolución de DALP, advirtió la existencia de alegaciones en la *Demanda* y en la *Demandan Enmendada* que estaban pendientes de adjudicar.

Luego de observar varios trámites,[9] los contendientes presentaron conjuntamente el *Informe enmendado de conferencia con antelación al juicio.*[10] En éste, estipularon las planillas de contribución sobre ingresos de DALP[11] y varios hechos acogidos en el dictamen apelado.

Los días 6, 7 y 24 de marzo de 2023 y el 20 de abril de 2023, se celebró el juicio en su fondo.[12] Por la parte demandante, testificó la señora Arocho Pirris y su perito, el CPA Eduardo Soria Rivera (CPA Soria Rivera), y se admitió en evidencia su *Informe preliminar sobre daños y valoración de Farmacia Domínguez.* Por la parte demandada, prestaron testimonios el señor Domínguez Lara y la CPA Frances Colón Rodríguez (CPA Colón Rodríguez), quien tiene a su cargo la contabilidad de DALP.

En su pronunciamiento judicial, el TPI reprodujo los seis enunciados fácticos consignados en la *Resolución* de 20 de junio de

---

[8] Apéndice, págs. 60-62.
[9] Por ejemplo, el TPI denegó una *Solicitud de Sentencia Sumaria Parcial* incoada por el señor Domínguez Lara por entender que era preciso determinar si DALP fue emplazada conforme a derecho y si procedía o no la acción derivativa. Un panel hermano se negó a revisar la *Resolución* emitida el 20 de junio de 2019 y notificada el día 24 siguiente. Véase, Apéndice, págs. 63-75; 76-86; 87-98; 105-115.
[10] Apéndice, págs. 116-132.
[11] Esta evidencia documental, al igual que otra prueba aludida en la *Sentencia* y en el juicio, no fue incluida en el expediente que revisamos; no obstante, consta en los Autos Originales, Tomo 2.
[12] Véanse las respectivas *Minutas* en los Autos Originales, Tomo 3.

2019.[13] En esencia, se determinó que las partes contrajeron matrimonio el 2 de junio de 1990 bajo el régimen de Sociedad Legal de Bienes Gananciales. Ambos establecieron un negocio denominado Farmacia Domínguez, el cual comenzó a operar como un DBA. Luego, el 14 de mayo de 2010, las partes organizaron en el Departamento de Estado a DALP Corporation, mediante la cual comenzó a operar la Farmacia Domínguez. Entonces, las partes peticionaron el divorcio por consentimiento mutuo. Como parte de las estipulaciones, en el inciso 2, página 9, acápite C de la *Petición de Divorcio*, se expresó que "**[e]xiste un negocio en común dedicado a proveer servicios de farmacia llamada Farmacia Domínguez. Dicho negocio será puesto en venta, se pagarán las deudas existentes del negocio y el dinero sobrante será dividido en partes iguales**". (Énfasis nuestro). El 27 de agosto de 2023, notificada el 13 de septiembre de 2023, el TPI dictó una *Sentencia* en la que acogió las estipulaciones contenidas en la *Petición*, incluyendo la antes citada.[14]

Evaluada la evidencia testifical y documental sometida, el TPI consignó, en lo pertinente, las siguientes determinaciones de hechos:

. . . . . . . .

7. La Demandante, señora Arocho Pirris, es farmacéutica de profesión y posee la licencia número 4036, expedida por el Departamento de Salud.

8. La Demandante ocupa el puesto de Secretaria de DALP; mientras que el Codemandado Domínguez Lara ocupa el puesto de Presidente de la Corporación.

. . . . . . . .

18. [...] [L]a Demandante declaró que tenía acceso irrestricto a la información de contabilidad de DALP, manejada por la CPA Frances Colón [Rodríguez].

19. También quedó establecido en el Juicio que, desde el comienzo de las operaciones de la Corporación, ni la Demandante, ni el Codemandado citaron a una Asamblea Anual Ordinaria de DALP Corporation. En torno a esto, la Demandante admitió en el Juicio que no utilizó el mecanismo establecido bajo el Artículo 7.01 de la Ley de

---

[13] Apéndice, págs. 89-90.
[14] Apéndice, págs. 1-24.

Corporaciones para pedirle a un tribunal competente que ordenara la celebración de la Asamblea Anual de DALP. [...].

20. Por otro lado, también quedó establecido que, en determinado momento, el Codemandado excluyó la firma de la Demandante de la cuenta bancaria de DALP en el Banco Popular de Puerto Rico por lo que, mediante *Orden* nuestra —dictada como medida cautelar en el caso— se restableció la firma de la Demandante y su acceso a dicha cuenta.

21. En el Juicio quedó establecido que la Demandante aceptó no tener prueba que el Codemandado se apropiara de dinero de la Corporación durante el período que su firma estuvo excluida de la cuenta bancaria corporativa en el BPPR.

22. La Corporación DALP tiene Artículos de Incorporación que fueron admitidos por estipulación. Sin embargo, también se estableció que la Corporación no tenía ni aprobó un reglamento ("bylaws") [...]

23. Las ventas totales de DALP para el año 2017 ascendieron a $1,243,653; para el año 2018, ascendieron a $1,367,443; para el año 2019, ascendieron a $1,425,893; para el año 2020, ascendieron a $1,416,054; y para el año 2021, ascendieron a $1,630,975.

24. [...] para el año 2022 las ventas de la Corporación sobrepasaron $1,900,000.

25. La farmacia de nombre Mi Farmacia Domínguez [y Mucho Más] pertenece a una corporación de nombre Latitud 18 Norte LLC, entidad que no fue traída al pleito por la Demandante.

26. A solicitud de la Demandante, cualificamos al CPA Eduardo Soria [Rivera] (en adelante, el "CPA Soria [Rivera]"), como perito en valoración de negocios y admitimos en evidencia su *Informe*, emitido el 19 de febrero de 2019.

.    .    .    .    .    .    .    .

30. Según el CPA Soria [Rivera], para calcular los daños reclamados por la Demandante alegadamente [*sic*] causados por la apertura de la nueva farmacia a poca distancia de la Farmacia Domínguez, utilizó el método de "antes y después", ("before and after"). Declaró en su examen directo que utilizó como supuesto para la conclusión de su *Informe* pericial que, como norma general, cuando en un negocio pequeño uno de los dueños se marcha y abre un negocio similar a corta distancia, se lleva consigo un equivalente en ventas y/o capital igual a su participación. De acuerdo a esta teoría, en un negocio perteneciente a dos personas, la partida de una de ellas representará para el negocio una disminución en ventas o capital de aproximadamente un 50%.

31. **Sin embargo**, durante el contrainterrogatorio del CPA Soria [Rivera], este fue confrontado con el hecho admitido por las partes y por la CPA Frances Colón [Rodríguez] que, luego de la apertura de la nueva farmacia a mediados del año 2018, **las ventas de la Farmacia Domínguez, en vez de disminuir, aumentaron**.

32. Determinamos que, al comparar las ventas reconocidas por las partes para el año 2022 de la Farmacia Domínguez, ascendentes a $1,900,000, con sus

ventas del año 2017 - (que es el año inmediatamente anterior a la apertura de la nueva farmacia) - ascendentes a $1,243,653, **es claro que las ventas de la Farmacia Domínguez <u>aumentaron en más de un 50%</u>**.

33. Por esto, el CPA Soria [Rivera] aceptó que, de ser correctas las ventas de [l]a Farmacia Domínguez informadas al Tribunal a base de la prueba documental y testifical presentada y admitida, <u>los supuestos de su opinión quedarían refutados</u>. [...]

34. Por otro lado, durante su examen directo, el CPA Soria [Rivera] declaró que la plusvalía es un activo intangible que puede generar un negocio por distintas razones, entre las cuales se encuentran: el nombre del negocio, la localización, cambios de población, calidad del servicio ofrecido, etc. Concluyó que la apertura de la nueva farmacia significó una devaluación de la plusvalía de DALP ascendente a $104,000.

35. Sin embargo, durante su contrainterrogatorio, el CPA Soria [Rivera] [...] [a]ceptó que, de las partes ponerse de acuerdo para liquidar la operación de la Farmacia, **no podría hablarse de un activo de plusvalía**, pues, las partes dispondrían de los activos de la Corporación/Farmacia, pagarían sus deudas y se dividirían el sobrante.

. . . . . . . .

37. Determinamos que el [Codemandado] impugnó exitosamente, las bases y fundamentos del testimonio e *Informe* del CPA Soria [Rivera] [...].

. . . . . . . .

39. Finalmente, en lo que concierne la solicitud de liquidación de la Corporación hecha por el Codemandado, la Demandante reconoció que, al divorciarse las partes, ambos estipularon que el negocio de ambos sería puesto en venta, se pagarían las deudas existentes del mismo y el dinero sobrante sería dividido en partes iguales. [...]. (Énfasis en el original).

Al tenor de las determinaciones allegadas, el TPI declaró *No Ha Lugar* la reclamación de la señora Arocho Pirris. De otro lado, concedió al señor Domínguez Lara la petición del pago de $104,000.00 a su favor. Además, el TPI ordenó la liquidación de DALP, según solicitado por las partes.

Inconforme, la señora Arocho Pirris presentó el recurso apelativo del epígrafe y señaló la comisión de los siguientes errores:

**PRIMER ERROR:** ERRÓ EL TPI AL NO CONCLUIR QUE EL APELADO HAB[Í]A VIOLENTADO SU DEBER DE FIDUCIA PARA CON LA APELANTE Y LA ENTIDAD DALP, QUE CAUSÓ DAÑOS ECONÓMICOS Y MORALES A LA APELANTE Y A DALP, AUN CUANDO LA PRUEBA DEMOSTRÓ CLARAMENTE QUE SUS ACTUACIONES VIOLENTARON SU OBLIGACIÓN COMO ACCIONISTA, DIRECTOR Y OFICIAL DE LA CORPORACIÓN.

**SEGUNDO ERROR:** ERRÓ EL TPI AL NO RECONOCER QUE EL APELADO NO OBRÓ CON BUENA FE, NI EN CUMPLIMIENTO CON SU OBLIGACIÓN COMO COMUNERO DE LA COMUNIDAD DE BIENES EXISTENTE ENTRE LAS PARTES, CAUSANDO CON SUS ACTUACIONES DAÑOS ECONÓMICOS Y MORALES A LA APELANTE Y LA ENTIDAD CORPORATIVA.

**TERCER ERROR:** ERRÓ EL TPI AL CONCEDER AL APELADO UN REMEDIO QUE ESTE RENUNCIÓ Y NO ALEGÓ AL ENMENDAR LA RECONVENCIÓN, DETERMINANDO QUE EL APELADO TIENE DERECHO A QUE SE LE PAGUE LA SUMA DE $104,000.00.

**CUARTO ERROR:** ERRÓ EL TPI AL DETERMINAR QUE EL APELADO TIENE DERECHO A QUE SE LE PAGUE LA SUMA DE $104,000.00, AUN CUANDO LA PRUEBA DETERMINÓ QUE LAS PARTES ERAN DUEÑOS EN PARTES IGUALES DE LOS ACTIVOS DEL NEGOCIO CONOCIDO COMO FARMACIA DOM[Í]NGUEZ.

El señor Domínguez Lara presentó su alegato el 17 de junio de 2024. Con el beneficio de su comparecencia, los Autos Originales y la Transcripción de la Prueba Oral (TPO), estamos en posición de resolver.

**II.**

**A.**

El Tribunal Supremo de Puerto Rico ha enfatizado la deferencia que los foros apelativos debemos conferir a la apreciación de la prueba testifical que realiza el juzgador o la juzgadora de hechos. *McConnell Jiménez v. Palau*, 161 DPR 734, 750 (2004); *Argüello v. Argüello*, 155 DPR 62, 78-79 (2001); *López Vicil v. ITT Intermedia Inc.*, 142 DPR 857, 864 (1997). En ese sentido, el alto foro ha enunciado que "la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013), reiterado en *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 792 (2020). En atención a esto, como regla general, **los tribunales apelativos no debemos intervenir con las determinaciones de hechos ni con la adjudicación de**

**credibilidad que haya efectuado el tribunal sentenciador**. Tampoco ostentamos facultad para sustituir las determinaciones del foro de primera instancia por nuestras propias apreciaciones. *Gómez Márquez et al. v. El Oriental, supra,* pág. 793; *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2005).

No obstante, debe recordarse que el arbitrio del juzgador o la juzgadora de hechos, si bien es respetable, no es absoluto y una "apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora" de los foros revisores. *Dávila Nieves v. Meléndez Marín, supra,* pág. 771-772. Por tanto, **podemos intervenir excepcionalmente con la apreciación de la prueba si el foro revisado incurrió en** pasión, prejuicio, parcialidad o **error manifiesto**. *Rolón v. Charlie Car Rental, Inc.,* 148 DPR 420, 433 (1999) y los casos allí citados. Se incurre, por ejemplo, en un error manifiesto cuando **la apreciación de la prueba se distancia de la realidad fáctica** o es inherentemente imposible o increíble. *Gómez Márquez et al. v. El Oriental, supra,* págs. 793-794.

**B.**

La Regla 702 de Evidencia, 32 LPRA Ap. VI, R. 702, regula el testimonio pericial. Reza la norma, en su parte pertinente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita —conforme a la Regla 703— podrá testificar en forma de opiniones o de otra manera. [...]

En nuestro ordenamiento jurídico, rige una norma liberal acerca de la capacidad de un testigo para declarar, pero no necesariamente para cualificarse como perito. A esos fines, la Regla 703 de Evidencia, 32 LPRA Ap. VI, R. 703, establece los criterios para la calificación de la persona perita, a saber: "su especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre

el cual habrá de prestar testimonio". A través de su educación o experiencia, el perito ha desarrollado un conocimiento o destreza sobre una materia, por lo cual puede formar una opinión que sirva de ayuda al juzgador de hechos. *S.L.G. Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010). Por tanto, una persona puede cualificarse como perito por los conocimientos especializados que posee, ya sean producto de su experiencia o de su educación. *Dye–Tex P.R., Inc. v. Royal Ins. Co. P.R.*, 150 DPR 658. 663 (2000).

Los tribunales tienen amplia discreción al apreciar la prueba pericial. Igualmente, los foros revisores nos encontramos en la misma posición de los foros primarios ante la evaluación de determinaciones de hechos fundamentadas en la prueba pericial. En tales situaciones, **podemos adoptar nuestro propio criterio en la apreciación o evaluación de la evidencia pericial o incluso descartarla, aunque resulte técnicamente correcta**. *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006); *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., supra*, págs. 662-663 y los casos allí citados.

El valor probatorio del testimonio pericial dependerá de varios factores, a saber: (1) **si el testimonio está basado en hechos o información suficiente**; (2) si el testimonio es producto de principios y métodos confiables; (3) si la persona aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) **la parcialidad de la persona testigo**. Regla 702 de Evidencia, *supra*. Estos criterios no constituyen una lista taxativa, toda vez que, para conferir valor probatorio al testimonio pericial, **lo esencial es su confiabilidad**.

**C.**

Una *corporación* ostenta una persona jurídica independiente

de la de sus constituyentes. Art. 217 del Cód. Civil, 31 LPRA sec. 5862. Por lo tanto, el ente jurídico se rige por sus cláusulas de incorporación o por cualquier documento constitutivo, según su particular naturaleza y destino, siempre que no sean contrarios a la ley ni contravengan el orden público. Art. 219 del Cód. Civil, 31 LPRA sec. 5864.

En lo pertinente, el Artículo 12.06 de la Ley Núm. 164 de 16 de diciembre de 2009, *Ley General de Corporaciones*, 14 LPRA sec. 3501 *et seq.*, sobre la acción derivativa, dispone como sigue:

> En cualquier pleito entablado por un accionista a beneficio de alguna corporación organizada con arreglo a las leyes del Estado Libre Asociado, deberá alegarse en la demanda que el demandante era accionista de la corporación cuando se efectuó la transacción impugnada, o que las acciones le fueron transferidas luego de la transacción por ministerio de ley. 14 LPRA sec. 3786.

La *acción derivativa* es un remedio basado en equidad utilizado "para vindicar los derechos de una corporación, cuando las personas llamadas a hacerlo no lo hacen". *Rivera Sanfeliz v. Jta. Dir. FirstBank*, 193 DPR 38, 54 (2015), que cita a J.F. Gierbolini Bonilla, *La acción derivativa como mecanismo de control y monitoreo en Puerto Rico*, 1 UPR Bus. L.J. 81, 82 (2010). Igualmente, se ha descrito como **aquel recurso "que un accionista presenta, no para evitar o remediar un daño, lesión, incumplimiento o abuso hacia él, sino hacia la corporación"**. (Énfasis nuestro). *Id.*, que cita a L.M. Negrón Portillo, *Derecho corporativo puertorriqueño*, 2da ed., 1996, pág. 428. La doctrina ha afirmado que la acción derivativa "es una reclamación judicial de una causa de acción de la corporación instada por los accionistas…". Por tanto, sirve "como un **mecanismo para exigir la rendición de cuentas o *accountability* por parte de sus administradores**…". (Énfasis nuestro). C. Díaz Olivo *Corporaciones, Tratado Sobre Derecho Corporativo*, 2016, pág. 418. Los requisitos para este remedio en equidad son: (1) la corporación debe incluirse como parte demandada; (2) la parte demandante debe

haber sido accionista al momento en que ocurrió el daño y durante todo el procedimiento judicial; (3) antes de acudir al tribunal, el accionista debe reclamar a los administradores de la corporación que tomen acción sobre el particular; (4) por tratarse de una acción en equidad, **el accionista está sujeto a las defensas tradicionales de equidad, como manos limpias, impedimento, incuria y renuncia, entre otras**; y (5) el pleito no debe transigirse ni desistirse sin autorización del tribunal. *Id.*, pág. 422.

De otro lado, la *disolución* es el proceso mediante el cual se pone fin a la existencia de la corporación. *Miramar Marine v. Citi Walk,* 198 DPR 684, 691 (2017). El Artículo 230 del Código Civil, 31 LPRA sec. 5892, *Destino del patrimonio,* establece que, "[s]i la persona jurídica deja de existir, se dará a sus bienes la aplicación y el destino asignado por las cláusulas de incorporación o el documento constitutivo, o en su defecto, por la ley". Junto con la disolución, pues, comienza la liquidación del ente corporativo. Durante este proceso, "[l]a corporación, entre otras cosas, tiene antes que **pagar las obligaciones pendientes, cobrar sus acreencias y distribuir cualquier sobrante entre los accionistas**, de conformidad a las prioridades que sus acciones les confieren". (Énfasis nuestro). *Miramar Marine v. Citi Walk, supra,* pág. 692, que cita a Díaz Olivo, *op. cit.*, págs. 381-382. Al respecto, el inciso (A) del Artículo 9.03 de la Ley General de Corporaciones, 14 LPRA sec. 3703, establece un mecanismo expedito para la disolución de corporaciones dedicadas a una empresa común compuestas por dos accionistas con igual cantidad de acciones.

> A. Excepto que el certificado de incorporación o un acuerdo escrito entre los accionistas disponga otra cosa, si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (*joint venture*), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal

empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y disponer de los activos utilizados en tal empresa de acuerdo con el plan que ambos accionistas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la corporación queda disuelta. [...].

Según surge de la disposición, para que un tribunal pueda ordenar la disolución de una corporación al amparo de dicha disposición, deben concurrir los siguientes elementos: (1) que se trate de una **corporación organizada con arreglo a las leyes de Puerto Rico**; (2) que tenga sólo **dos accionistas**, cada uno con el **cincuenta por ciento de las acciones**; (3) que se dedique al logro de una **empresa común**; y (4) que haya un **desacuerdo entre los accionistas** sobre la deseabilidad de descontinuar tal empresa común. C. Díaz Olivo, *op. cit.*, pág. 377.

En *Llorens et al. v. Arribas et al.*, 184 DPR 32, 62 (2011), nuestro Tribunal Supremo interpretó el concepto *empresa común* al expresar que, "como mínimo, **una empresa común es aquella que se dedica a un solo negocio**...". (Énfasis nuestro). Al determinar si se está ante una empresa común en el contexto del Artículo 9.03 de la Ley General de Corporaciones, *supra*, se debe auscultar la situación a la luz de los factores siguientes: (1) si existe una comunidad de intereses en el cumplimiento de un propósito común; (2) si hay un control o derecho de control conjunto; (3) si existe un interés propietario conjunto, es decir, si ambos accionistas aportan con su industria, capital o de alguna otra manera al logro del fin común; (4) si existe el derecho a compartir las ganancias; y (5) si existe el deber de compartir las pérdidas. *Id.*

En la aludida jurisprudencia, acotó la máxima curia que, si el accionista que reclama ha faltado a sus deberes de fiducia, responde en daños ante la corporación o solicita la disolución para adelantar sus propios intereses comerciales, **ello será impertinente al**

**proceso según el Artículo 9.03**.[15] *Id.*, pág. 63. Es decir, el alto foro opinó que, una vez se cumplen los elementos del Artículo 9.03, el tribunal ordenará la disolución de la corporación. *Id.*, págs. 63-64. Ello así, porque "la discreción de los tribunales para negarse a dictar dicha orden es extremadamente limitada". *Id.*, pág. 63.

Dentro del marco jurídico antes enunciado, procedamos a discutir a continuación los señalamientos de error esbozados.

### III.

### A.

En el primer y segundo señalamientos de error, los cuales discutiremos en conjunto por su relación, la señora Arocho Pirris alega que el TPI incidió al concluir que el señor Domínguez Lara, como accionista, director y oficial de DALP, no violó su deber de fiducia ni causó los alegados daños a la apelante y a la entidad corporativa en común.

Al argumentar, la apelante plantea que el apelado violó su deber de fiducia con DALP al establecer Mi Farmacia Domínguez y Mucho Más. En particular, al situar el negocio en las cercanías de la Farmacia Domínguez, utilizar un nombre similar, servirse de la información privilegiada del negocio sobre suplidores y contratar a los mismos empleados. Trajo a colación el *Informe* pericial admitido en evidencia, el cual estimó los daños a DALP en $104,000.00.[16] Asimismo, insistió en que su salario debía ser de $143,000.00, en lugar de $64,300.00, y que era acreedora de $492,819.00 por los años de 2013 a 2018, según concluido por el CPA Soria Rivera.

Examinemos los testimonios vertidos en la vista en su fondo.

---

[15] El tratadista Díaz Olivo sostiene que, si uno de los accionistas ocasionó daños a la corporación al violentar sus deberes fiduciarios, el ente jurídico "podrá reclamarle su importe y descontarlo de cualquier balance que finalmente pueda corresponderle en la liquidación". C. Díaz Olivo, *op. cit.*, pág. 381.
[16] Apéndice, pág. 174 (la pág. 176 está repetida).

**(i)**

### *Emma Arocho Pirris*[17]

La testigo es licenciada en farmacia desde 1989.[18] En 1998, junto a su entonces esposo, el señor Domínguez Lara, comenzó operaciones el DBA Farmacia Domínguez. En 2010, vigente el matrimonio entre los litigantes, continuaron el negocio a través de DALP Corporation con una participación de cincuenta por ciento (50%) cada uno.[19]

Explicó que el señor Domínguez Lara se ocupaba de la nómina de los empleados de la Farmacia Domínguez, pero que no laboraba día a día en el establecimiento. Dijo que el apelado ganaba unos $64,000.00 al año desde que DALP se incorporó.[20] Explicó que éste se encargaba también de someter las planillas corporativas.[21] Asimismo, la testigo aseveró que el apelado intervenía muy poco con el pago a suplidores y que, hasta donde sabía, no tenía comunicación con las aseguradoras.[22]

La señora Arocho Pirris denunció que para el 2015 el señor Domínguez Lara la removió de la cuenta comercial y del acceso a información bancaria por lo que tuvo que acudir a la intervención judicial para restablecerlas.[23] Ese año el apelado cambió el certificado de incorporación para designarse como agente residente y cambió la dirección de DALP a un apartado postal a la que la señora Arocho Pirris no tenía acceso.[24] También imputó al señor Domínguez Lara apropiarse de dinero en relación con dos cheques emitidos como reembolso de una convención y el pago por servicios

---

[17] Es meritorio mencionar que durante el testimonio de la señora Arocho Pirris se aludieron a documentos que no forman parte del expediente que revisamos.
[18] Transcripción de la Prueba Oral (TPO) 6 de marzo de 2023, pág. 14 líneas 3-8.
[19] TPO 6 de marzo de 2023, págs. 14 líneas 20-25; 15 líneas 1-8; 17 19-21.
[20] TPO 6 de marzo de 2023, págs. 58 líneas 15-25; 59 líneas 1-13; 81 líneas 8-10.
[21] TPO 6 de marzo de 2023, págs. 46 líneas 24-25; 47 líneas 1-3.
[22] TPO 6 de marzo de 2023, págs. 81 líneas 17-25; 82 líneas 1-5.
[23] TPO 6 de marzo de 2023, págs. 44 líneas 7-25; 45; 46 líneas 1-19; 135 líneas 15-19.
[24] TPO 6 de marzo de 2023, pág. 49 líneas 2-12.

legales. Luego, la testigo tuvo que reconocer que a ella también se le restituyeron los gastos de la convención.[25]

La declarante atestiguó que fungía como la farmacéutica regente y ejercía funciones gerenciales en la Farmacia Domínguez. Trabajaba seis días a la semana, de lunes a sábado. Explicó que la Farmacia Domínguez tenía sólo un punto de ventas o caja donde se registraban todas las transacciones de manera segregada, independientemente de la forma de pago: tarjeta o efectivo.[26] Ahora, los pagos por ATH Móvil ingresaban a otra cuenta a la que sólo ella tenía acceso. Empero, aseguró que sólo se realizaban depósitos, no retiros, y que la CPA Colón Rodríguez estaba informada.[27]

Acotó que DALP tenía dos cuentas comerciales controladas por el apelado. Añadió, sin embargo, que la CPA Colón Rodríguez era quien realizaba la contabilidad de DALP.[28] Aun cuando la comunicación normalmente fluía entre el señor Domínguez Lara y la CPA Colón Rodríguez, reconoció que ésta le enviaba la información según la solicitaba. "No, no hay restricción".[29]

En cuanto a las transacciones en efectivo, la testigo aseveró que se hacía un cuadre de caja y ella efectuaba los depósitos.[30] Aseguró que depositaba todo el efectivo, salvo el dinero destinado a necesidades del negocio, el pago de suplidores y, en ocasiones, la retribución a empleados y a otros farmacéuticos.[31] Entre las necesidades del negocio, la testigo mencionó el pago de la renta, de cuyo edificio es titular.[32] Apuntó que hacía las retenciones de ley,

---

[25] TPO 6 de marzo de 2023, págs. 132 líneas 22-25; 133.
[26] TPO 6 de marzo de 2023, págs. 24; 63 líneas 3-8; 25 líneas 11-12; 64 líneas 12-21; 66 líneas 3-8.
[27] TPO 6 de marzo de 2023, pág. 144 líneas 2-16; 155-156.
[28] TPO 6 de marzo de 2023, pág. 60 líneas 21-25.
[29] TPO 6 de marzo de 2023, págs. 61 líneas 3-7; 112; 113 líneas 1-2.
[30] TPO 6 de marzo de 2023, pág. 65 líneas 2-16.
[31] TPO 6 de marzo de 2023, págs. 117 líneas 24-25; 118 líneas 1-10; 126 líneas 8-16; 131 líneas 19-25. Con relación a los suplidores, la señora Arocho Pirris dijo que también se encargaba de la planilla del IVU. Véase, TPO 6 de marzo de 2023, pág. 164 líneas 2-13.
[32] TPO 6 de marzo de 2023, pág. 153 líneas 11-17. El inmueble arrendado es propiedad de la apelante; véase, Determinación de Hechos 16 en el Apéndice, pág. 8.

aunque afirmó que las planillas correspondientes las llenaba la CPA Colón Rodríguez.[33] Si bien estas declaraciones fueron impugnadas con lo declarado en la deposición tomada en 2017, la testigo reiteró que la CPA Colón Rodríguez preparaba los formularios contables.[34]

Asimismo, asintió al preguntársele sobre si la CPA Colón Rodríguez le había señalado que, al tratar de reconciliar las ventas en efectivo, de los estados del banco y la información que la testigo reportaba, restaba una cuantía sin contabilizar.[35] Es decir, aun cuando se le había requerido que depositara la totalidad de las ventas en efectivo, la apelante pagaba las facturas mediante efectivo, en lugar de cheques.[36] "… yo no tengo cheques firmados para pagar con cheques. Así que para mantener el negocio día a día hay que suplirlo de mercancía".[37] Insistió en que informaba en detalle a la CPA Colón Rodríguez el uso del efectivo.[38]

Por otra parte, según lo declarado y estipulado por las partes, en el 2015 la apelante solicitó un aumento de salario y el mismo le fue denegado.[39] Las partes contendientes estipularon que ninguno de los dos accionistas formaba parte de un taller unionado sujeto a un convenio colectivo que hubiese establecido escalas salariales.[40] La apelante tampoco tenía un contrato de empleo.[41] Sin embargo, la señora Arocho Pirris indicó que, conforme con el libre mercado, los otros farmacéuticos contratados en la Farmacia Domínguez ganaban más que ella. Cabe señalar que el *Informe* pericial que la apelante sometió como parte de su prueba, estableció un salario de $25.00 la hora, a base de cincuenta (50) horas laborables semanales

---

[33] TPO 6 de marzo de 2023, págs. 121 líneas 13-20; 122 líneas 1-12; 132 líneas 8-11.
[34] TPO 6 de marzo de 2023, págs. 124-125; 154 líneas 11-20. Véase, *Deposición* de la señora Arocho Pirris de 8 de febrero de 2017, Autos Originales, Tomo 1.
[35] TPO 6 de marzo de 2023, págs. 129 líneas 17-25; 130 líneas 1-7; 170 líneas 19-24.
[36] TPO 6 de marzo de 2023, pág. 130 líneas 8-23.
[37] TPO 6 de marzo de 2023, pág. 153 líneas 2-5.
[38] TPO 6 de marzo de 2023, págs. 153 líneas 23-25; 154 líneas 1-10.
[39] TPO 6 de marzo de 2023, págs. 26 líneas 17-22; 27 líneas 5-11; 43 líneas 4-17.
[40] TPO 6 de marzo de 2023, pág. 87 líneas 2-6.
[41] TPO 6 de marzo de 2023, pág. 87 líneas 12-18.

($64,300.00). Conforme el dictamen, el salario de la apelante es de $64,000.00 anuales.[42]

En torno a la acción derivativa incoada, la testigo enunció que el señor Domínguez se designó como presidente, secretario y tesorero de la entidad corporativa.[43] Sin embargo, esta afirmación fue contrastada con los informes anuales en los que ella aparece como secretaria.[44] A pesar de alegar la falta de reuniones anuales ("Nunca ha habido reuniones corporativas, nunca se ha citado".[45]), la señora Arocho Pirris admitió que no ha acudido a los tribunales por un remedio.[46] Claro está, defendió sus responsabilidades como secretaria al aseverar que, a falta de reuniones, entonces, no había minutas que redactar.[47]

La señora Arocho Pirris declaró que en 2018 advino en conocimiento que el señor Domínguez Lara iba a establecer otra farmacia "en un sitio bien cercano al nuestro".[48] El referido negocio, llamado Mi Farmacia Domínguez y Mucho Más, operaba desde mayo de 2018 y ubica a unos diez minutos caminando desde la Farmacia Domínguez.[49] Se atestiguó que Mi Farmacia Domínguez y Mucho Más pertenece a una corporación denominada Latitud 18 que no es parte del pleito.[50] La apelante denunció que Mi Farmacia Domínguez y Mucho Más ha causado confusión entre pacientes, médicos, empleados gubernamentales y suplidores.[51]

> R. Se nos ha duplicado el trabajo porque las personas llegan a nuestro recetario a buscar su receta y la receta el doctor la ha enviado a la otra farmacia, así que las personas se molestan. Este… y ha pasado que los empleados han tenido que entonces llamar a los médicos,

---

[42] TPO 6 de marzo de 2023, págs. 88 líneas 9-18; 162 líneas 17-21. Además, Determinación de Hechos 12 de la *Sentencia* y Apéndice, pág. 173.
[43] TPO 6 de marzo de 2023, pág. 23 líneas 5-16.
[44] TPO 6 de marzo de 2023, pág. 110 líneas 10-15.
[45] TPO 6 de marzo de 2023, pág. 23 líneas 22-23.
[46] TPO 6 de marzo de 2023, págs. 143 líneas 3-19.
[47] TPO 6 de marzo de 2023, pág. 152 líneas 9-19.
[48] TPO 6 de marzo de 2023, págs. 58 líneas 2-6; 66 líneas 20-24.
[49] TPO 6 de marzo de 2023, pág. 67 líneas 3-18.
[50] TPO 6 de marzo de 2023, pág. 145 líneas 6-11.
[51] TPO 6 de marzo de 2023, págs. 67 líneas 19-25; 68 líneas 1-2.

"mire, doctor, tengo el paciente aquí, ¿usted puede volver a enviar la receta?", eso desestabiliza...[52]

.        .        .        .        .        .        .        .

R. Uno de los métodos para recibir recetas es de manera electrónica y los médicos queriendo enviar las recetas a Farmacia Domínguez seleccionan Mi Farmacia Domínguez [y Mucho Más] y el documento llega a un sitio y el paciente a otro.

P. ¿Qué efecto, si alguno, ha tenido esto en las ventas de la Farmacia Domínguez, la original?

R. Sí, hemos perdido muchos pacientes porque una vez el doctor envía receta a otro sitio a veces es imposible que el doctor la vuelva a reenviar.[53]

La señora Arocho Pirris declaró sobre cómo supuestamente se han afectado las ventas y que la confusión antes descrita había incidido sobre el valor del negocio.[54] Sin embargo, admitió que no existía impedimento legal para que el señor Domínguez Lara estableciera otra farmacia y la nombrara con su apellido.[55] Igualmente, **confirmó las cifras ascendentes por concepto de las ventas registradas en la Farmacia Domínguez, a saber: 2017—$1,243,653; 2018—$1,367,443; 2019—$1,425,893; 2020—$1,416,054; y 2021—$1,630,975**.[56]

A preguntas de la representación legal del señor Domínguez Lara, la señora Arocho Pirris admitió que, como parte de las estipulaciones del divorcio por consentimiento mutuo, las partes acordaron que pondrían en venta la Farmacia Domínguez, pagarían las deudas existentes y el sobrante se dividiría en partes iguales. Reafirmó que la estipulación no estaba sujeta a condición alguna.[57] Luego, mencionó que, como parte de las negociaciones, era su deseo quedarse como farmacéutica regente, independientemente de quién fuera el comprador.[58] Reconoció que el señor Domínguez Lara ofreció disolver la corporación en común.[59] Sin embargo, previo a la

---

[52] TPO 6 de marzo de 2023, págs. 69 líneas 23-25; 70 líneas 1-4.
[53] TPO 6 de marzo de 2023, pág. 71 líneas 3-12.
[54] TPO 6 de marzo de 2023, págs. 71 líneas 17-18; 72 línea 4.
[55] TPO 6 de marzo de 2023, págs. 147 líneas 12-25; 148 líneas 1-6.
[56] TPO 6 de marzo de 2023, págs. 145 líneas 18-25; 146 líneas 1-6.
[57] TPO 6 de marzo de 2023, págs. 93-94.
[58] TPO 6 de marzo de 2023, págs. 101 líneas 19-25; 102 líneas 1-3; 150 líneas 22-25; 151 líneas 1-2.
[59] TPO 6 de marzo de 2023, págs. 105 líneas 7-11; 165 líneas 9-12.

disolución, la señora Arocho Pirris requiere que primero le liquiden sus reclamaciones.[60]

### *CPA Eduardo Soria Rivera*[61]

En lo que nos atañe, para computar los daños alegados a la Farmacia Domínguez en $104,000.00, el perito utilizó el método *before-and-after*.[62] Indicó que este método compara distintos periodos de tiempo.[63] Agregó como teoría lo que sigue:

> [C]uando hay dos accionistas que, ¿verdad?, que, ¿verdad?, que tienen... que tienen problemas y uno de los accionistas decide montar un negocio similar con la misma básicamente la misma estructura que tenía el otro, en este caso con el mismo nombre, y más importante, bien cercano, en la cuestión de la farmacia la localización es bien importante, y, obviamente, pues conociendo los clientes, es automático que yo pienso que eso tiene que haber tenido el efecto de disminuir el valor de la... de la corporación, de la farmacia. A mí me parece bien lógico, es inescapable. Es imposible que eso ocurra sin bajarle el valor de la otra entidad porque estás dividiendo un punto de ventas en dos...[64]

Es decir, para el CPA Soria Rivera, el establecimiento bien cercano del mismo tipo de negocio, con los mismos suplidores, los mismos clientes y el nombre similar "es bien difícil no razonar que en efecto se está llevando parte de la plusvalía";[65] aunque aclaró que eso era una presunción automática, sujeta a evaluación.[66] Explicó que la plusvalía eran varios componentes; a saber, los clientes, localización, suplidores y empleados.[67] Ante los asuntos de la ubicación y el nombre de Mi Farmacia Domínguez y Mucho Más, en particular, opinó que, aun cuando no había un impedimento legal

---

[60] TPO 6 de marzo de 2023, págs. 166 líneas 23-24; 167 líneas 1-3, 25; 168 líneas 1-4.

[61] Refiérase a las Determinaciones de Hechos 27, 28 y 29 de la *Sentencia* sobre la cualificación del perito, su encomienda y fuentes analizadas, en el Apéndice, pág. 10. Además, véase el *Informe preliminar sobre daños y valoración de Farmacia Domínguez*, en el Apéndice, págs. 166-181 (falta la pág. 8 del documento); y TPO 7 de marzo de 2023, págs. 4-29.

[62] TPO 7 de marzo de 2023, págs. 37 líneas 22-24; 76 líneas 13-15.

[63] TPO 7 de marzo de 2023, págs. 38 líneas 24-25; 39 líneas 1-3.

[64] TPO 7 de marzo de 2023, pág. 63 líneas 2-14. Véase, TPO 24 de marzo de 2023, págs. 6 línea 25; 7-8.

[65] TPO 7 de marzo de 2023, pág. 64 líneas 15-19.

[66] TPO 7 de marzo de 2023, pág. 64 líneas 20-23.

[67] TPO 7 de marzo de 2023, pág. 62 líneas 15-20. Véase, además, TPO 24 de marzo de 2023, pág. 6 líneas 2-18.

para establecer el negocio, "podría haber una queja comoquiera".[68] El CPA Soria Rivera no conocía de ninguna reclamación de la apelante para que el apelado cambiara el nombre de su negocio.[69] Afirmó que el nombre comercial es parte de la plusvalía y que por eso existían las patentes y los "trademarks".[70] Del mismo modo, asintió ante la premisa de que la plusvalía no se registraba en los libros contables, de conformidad con los principios de contabilidad generalmente aceptados.[71] Dijo: "La plusvalía existe, pero no está registrada".[72]

Al hacer la valoración entre 2017 y 2018, **el perito observó una disminución de un cincuenta por ciento (50%) en el flujo de efectivo neto ("net cash flow")**. Coligió que "la disminución en valor significa que el *goodwill* se fue para otro sitio o se perdió *goodwill...*".[73] El perito reconoció también que todas las valorizaciones de 2017 estaban impactadas por el huracán María.[74]

No obstante, el perito no consideró en su *Informe* la obligación pactada por los accionistas de DALP de vender la Farmacia Domínguez.[75] Opinó que dicho acuerdo no afectaba que un tercero pagara por la plusvalía o el "intangible que se puede utilizar para generar ingresos en un negocio particular". Es decir, para él la continuidad de la operación del negocio o "going concern" no tiene que ver con el trámite de la disolución.[76] La representación legal del apelado cuestionó al experto si conocía de ofertas de compra del negocio ascendentes a $400,000.00 aun cuando el CPA Soria Rivera,

---

[68] TPO 7 de marzo de 2023, pág. 124 líneas 15-21.
[69] TPO 7 de marzo de 2023, págs. 126 líneas19-25; 127 líneas 1-8.
[70] TPO 24 de marzo de 2023, págs. 34 líneas 21-25; 35 línea 1.
[71] TPO 24 de marzo de 2023, pág. 42 líneas 12-17.
[72] TPO 24 de marzo de 2023, pág. 44, línea 14.
[73] TPO 7 de marzo de 2023, págs. 69 líneas 17-18; 71 líneas 16-22. Véase, Apéndice, pág. 179 y su corrección en la TPO 7 de marzo de 2023, pág. 71 líneas 22-24.
[74] TPO 7 de marzo de 2023, pág. 133 líneas 21-23.
[75] TPO 7 de marzo de 2023, pág. 82 líneas 3-14.
[76] TPO 7 de marzo de 2023, págs. 91 líneas 22-25; 98 líneas 1-6; 129 líneas 7-19.

a 2018, valoró la Farmacia Domínguez en $79,000.00.[77] Indicó que ese dato no lo utilizaba en su valoración.[78]

Por igual, el perito fue confrontado con el aumento en ventas que observó el negocio entre 2017 y 2018. Reconoció que las planillas de contribuciones eran una fuente fiable para acreditar el aumento en ventas.[79] Por ello, **asintió ante la cuestión de que un aumento en ventas del negocio contradecía su hipótesis de debilidad y división de la plusvalía**.[80] En fin, el perito fue confrontado con los datos de las planillas y aceptó que el aumento en ventas reflejado dio al traste con los supuestos de su *Informe* pericial.[81]

De otra parte, enunció que, "**[a] base de las planillas no, tiene que haber habido más gastos**".[82] (Énfasis nuestro). Claro, al CPA Soria Rivera no le constaban las advertencias que la CPA Colón Rodríguez le había hecho a la señora Arocho Pirris sobre la obligación de depositar todo el efectivo que se generaba en las ventas.[83] Al conocer esta información, según su opinión inicial, dijo que no era necesario que el efectivo se depositara para que la contabilidad estuviera bien reflejada y, por consiguiente, pudiese hacerse un informe de valoración.[84] Luego, expresó que sería normal que en un "management letter" un auditor le señalara a la gerencia la necesidad de depositar todo el dinero en efectivo de las ventas para evitar que alguien lo pueda sustraer y aseveró que "lo mejor es registrarlo todo...".[85]

Con respecto a las cuestiones de salario, el CPA Soria Rivera realizó un cómputo del salario del demandado a base de $64,300.00

---

[77] TPO 7 de marzo de 2023, pág. 84 líneas 5-15.
[78] TPO 7 de marzo de 2023, pág. 86 líneas 15-17.
[79] TPO 24 de marzo de 2023, pág. 46 líneas 13-20.
[80] TPO 24 de marzo de 2023, págs. 47 líneas 22-25; 48 líneas 1-4.
[81] TPO 24 de marzo de 2023, págs. 52-54; 55 líneas 1-14.
[82] TPO 7 de marzo de 2023, págs. 92 líneas 21-25; 93 líneas 1-5; 102 líneas 2-6.
[83] TPO 7 de marzo de 2023, pág. 107 líneas 11-16.
[84] TPO 7 de marzo de 2023, pág. 107 líneas 17-24.
[85] TPO 24 de marzo de 2023, págs. 57 líneas 18-25; 58; 59 líneas 1-16.

y bajo la premisa de que el "[s]alario es una compensación por unos servicios rendidos".[86] En cuanto al mismo, concluyó que el salario devengado por el señor Domínguez Lara en la Farmacia Domínguez en realidad constituía un dividendo, en la medida que el salario excedía las tareas realizadas por el apelado.[87] Las tareas que describió consistieron en gestiones administrativas, compras y procesamiento de nóminas.[88] Por consiguiente, le imputó un salario por hora de $40.00. La diferencia entre lo imputado y lo devengado lo consideró como el pago de dividendos o un gasto no operacional, es decir, que no era necesario para la operación del negocio.[89] Apuntó, entonces, que la señora Arocho Pirris tenía un crédito del cincuenta por ciento (50%) de lo pagado en exceso.[90]

Con relación al salario de la señora Arocho Pirris, el perito dijo que comparó el devengado por la apelante con el del mercado, para determinar si era o no razonable.[91] Concluyó que el salario por unas cincuenta (50) horas laborables de la apelante era de $25.00 cuando debió ser de $55.00. Por lo tanto, coligió que la diferencia constituía un daño a favor de la apelante y ésta era acreedora de un crédito. "[E]lla está ganándose la mitad de lo que se debería ganar".[92] Declaró también sobre el *shortage* de farmacéuticos en el mercado lo que implicaba que aumentara su valor.[93] El perito ignoraba sobre la existencia o no de un contrato o convenio entre los accionistas.[94]

### Benigno Domínguez Lara

El señor Domínguez Lara, al igual que la apelante, también es farmacéutico.[95] En cuanto a las reclamaciones en su contra, el

---

[86] TPO 7 de marzo de 2023, págs. 36 líneas 7-8; 45 líneas 7-8.
[87] TPO 7 de marzo de 2023, pág. 36 líneas 9-18.
[88] TPO 7 de marzo de 2023, pág. 45 líneas 8-13.
[89] TPO 7 de marzo de 2023, págs. 46; 47 línea 1; 56 líneas 16-20.
[90] TPO 7 de marzo de 2023, pág. 57 líneas 10-12.
[91] TPO 7 de marzo de 2023, pág. 41 líneas 6-19.
[92] TPO 7 de marzo de 2023, págs. 42 líneas 9-21; 43 líneas 3-7; 75 líneas 13-20.
[93] TPO 7 de marzo de 2023, pág. 44 líneas 2-9.
[94] TPO 7 de marzo de 2023, pág. 122 líneas 10-17.
[95] TPO 24 de marzo de 2023, pág. 103 líneas 22-25.

apelado reconoció que no ha habido reuniones corporativas.[96] De otro lado, en sala, se leyó el segundo inciso de la *Petición de Divorcio,* cuyas estipulaciones acogió la *Sentencia* de 13 de marzo de 2013 en el caso EDI2012-1457. Dice: "*Existe un negocio en común dedicado a proveer servicios de farmacia llamado Farmacia Domínguez. Dicho negocio será puesto en venta, se pagarán las deudas existentes del negocio y el dinero sobrante será dividido en partes iguales*".[97] El apelado narró que, en aquel momento, hubo un comprador interesado, el señor Iván Alemán, cuya oferta fue de $425,000.00.[98] Añadió que él mismo hizo una oferta de compra, pero la señora Atochó Pirris se negó a que el apelado fuera el comprador.[99] La oferta por la participación de la señora Arocho Pirris fue de unos $200,000.00 o $350,000.00 con el inmueble donde ubica el negocio. Ella no aceptó.[100] Así, pues, ante la relación nula entre las partes, el apelado expresó que su deseo era disolver a DALP.[101] Añadió que las negociaciones de venta se paralizaron por el reclamo, entre otros, del retroactivo de salarios de la apelante.[102]

El testigo describió sus funciones en la Farmacia Domínguez.

Desde el divorcio para acá mayormente manejaba lo que son la contabilidad y la administración de la contabilidad en cuanto a la documentación que se necesita a través de la CPA que nos solicite, y digo que lo solicite porque hay una parte que yo las... yo las puedo someter, otras no. Hago las nóminas y trabajo con los suplidores más grandes, que son las dos droguerías más grandes. En adición a eso, también me encargo con lo que es el grupo de compra que es Coopharma.[103]

Las labores de nómina, contabilidad y pago de suplidores se realizan junto a la firma ADP, la CPA Colón Rodríguez y una

---

[96] TPO 24 de marzo, pág. 158 líneas 7-14.
[97] TPO 24 de marzo de 2023, págs. 108-110; 111 líneas 1-5.
[98] TPO 24 de marzo de 2023, págs. 112 líneas 17-25; 123 líneas 8-16.
[99] TPO 24 de marzo de 2023, págs. 123 línea 25; 124 líneas 1-6.
[100] TPO 24 de marzo de 2023, págs. 188 líneas 5-18; 189 líneas 2-12.
[101] TPO 24 de marzo de 2023, pág. 124 líneas 7-13.
[102] TPO 24 de marzo de 2023, pág. 189 líneas 13-18.
[103] TPO 24 de marzo de 2023, pág. 127 líneas 3-11.

exempleada, respectivamente.[104] Presencialmente, dijo que acudía a la Farmacia Domínguez unas dos a tres horas semanales.[105]

Sostuvo que el salario de ambas partes fue determinado por el apelado y ella consintió.[106] Testificó que, en parte, se determinó esa suma porque la apelante recibía $2,500.00 como renta del edificio, el cual "se lo coge ella directamente del *cash*".[107] Señaló que de manera unilateral la apelante redujo el espacio arrendado y no disminuyó el canon de renta. Aclaró también que, entre DALP y la apelante, no existía un contrato de arrendamiento.[108]

Admitió que trabajó como farmacéutico regente en la Droguería Betances donde devengó un salario de $100,000.00 anuales. En otros talleres de trabajo como farmacéutico, ganó $47.00 y $50.00 la hora.[109] En cuanto a su nuevo negocio, testificó que opera Mi Farmacia Domínguez y Mucho Más desde mayo de 2018, a la que le dedica unas 35 a 40 horas semanales, incluyendo sábados alternos.[110] Confirmó que el establecimiento ubica a unos minutos de la original; así como que, luego de renunciar a la Farmacia Domínguez, algunos de sus empleados laboran en su negocio.[111]

El señor Domínguez Lara testimonió también sobre las deficiencias en los depósitos de las ventas en efectivo de la Farmacia Domínguez.

> Eso es un tema que lo he tocado por *e-mail* con la señora Arocho en varias ocasiones y que también nos lo ha señalado en algunas ocasiones la CPA sobre que el efectivo no se está depositando de la manera correcta, ¿por qué?, porque los sistemas de punto de ventas te pueden demostrar qué entró en efectivo *versus* qué se cobró por tarjetas, *versus* qué se pagó por cheques y cuando tú manejas esa información se nota que no está

---

[104] TPO 24 de marzo de 2023, págs. 159-160.
[105] TPO 24 de marzo de 2023, pág. 173 líneas 15-23.
[106] TPO 24 de marzo de 2023, pág. 134 líneas 2-11.
[107] TPO 24 de marzo de 2023, pág. 186 líneas 1-13.
[108] TPO 24 de marzo de 2023, pág. 186 líneas 7-25.
[109] TPO 24 de marzo de 2024, pág. 135.
[110] TPO 24 de marzo de 2023, págs. 174 líneas 12-20; 175 líneas 5-7.
[111] TPO 24 de marzo de 2023, págs. 176 líneas 8-14; 180 líneas 17-21.

correctamente balanceado con lo que debería de ser de acuerdo a la contabilidad reportada.[112]

Por un lado, negó que haya detectado alguna transferencia de la cuenta bancaria de DALP a la cuenta personal de la señora Arocho Pirris;[113] por otro, constató que de la cuenta que recibe los pagos por ATH Móvil no tiene información.[114] "[Y]o sé lo que entra por sistema en la farmacia en *cash* pero no cómo se utiliza".[115] Ello así, porque la señora Arocho Pirris no copia al apelado cuando suministra esa información.[116]

### CPA Frances Colón Rodríguez

La CPA Colón Rodríguez, quien practica su profesión desde el 1995,[117] testificó que utiliza el método contable de acumulación ("accrual basis").[118] En éste, "al final […] se acumulan, pues, los gastos que no han sido desembolsados y se registran las transacciones de ventas que no han llegado, ¿verdad? no se han depositado en el banco o cuentas a cobrar…".[119] Además, se acumula la depreciación de los activos.[120]

Declaró que la Farmacia Domínguez presenta una debilidad en los controles de gastos.[121] Por consiguiente, **opinó que el control de efectivo que recae sobre la señora Arocho Pirris no era afín a las prácticas contables**.[122] Indicó que debía haber más controles en los depósitos y cuadres de ventas.[123] Incluso, testificó mediante un *exhibit* estipulado (no incluido en el Apéndice) sobre su preocupación en la falta de registros de pagos a suplidores y

---

[112] TPO 24 de marzo de 2023, pág. 128 líneas 10-19.
[113] TPO 24 de marzo de 2023, pág. 183 líneas 16-21.
[114] TPO 24 de marzo de 2023, pág. 185 líneas 1-19.
[115] TPO 24 de marzo de 2023, pág. 192 líneas 22-25.
[116] TPO 24 de marzo de 2023, pág. 196 líneas 18-25.
[117] TPO 20 de abril de 2023, pág. 9 líneas 2-3. (La TPO dice 21, pero la *Minuta* es del día 20).
[118] TPO 20 de abril de 2024, pág. 9 líneas 18-24
[119] TPO 20 de abril de 2023, pág. 10 líneas 9-13.
[120] TPO 20 de abril de 2023, pág. 11 líneas 5-6.
[121] TPO 20 de abril de 2023, págs. 11-12.
[122] Refiérase a los Principios Contables Generalmente Aceptados (GAAP, por sus siglas en inglés). TPO 20 de abril de 2023, págs. 15 líneas 13-24; 26 líneas 21-25.
[123] TPO 20 de abril de 2023, pág. 16 líneas 4-7.

servicios profesionales, lo que pudiera constituir violaciones a las leyes contributivas.[124]

Manifestó que, en torno a las **ventas de 2022**, la Farmacia Domínguez tuvo un aumento significativo, el cual **estimó en $1,900,000.00** sin incluir otros ingresos.[125] Con respecto a Mi Farmacia Domínguez y Mucho Más, la CPA Colón Rodríguez reconoció que realizaba su contabilidad, al igual que la de índole personal del apelado.[126]

**(ii)**

En la causa presente, la señora Arocho Pirris no sometió un alegato suplementario, por lo que su impugnación no va dirigida a las determinaciones de hechos esbozadas en la *Sentencia* apelada. A esos efectos, luego de la revisión de la TPO, hemos constatado que, salvo la Determinación de Hechos 38 que discutiremos más adelante, **el resto de los enunciados fácticos del dictamen se sostienen con las declaraciones escuchadas en el juicio y creídas por el TPI**. Tales aseveraciones gozan de gran deferencia y, en este caso, no ameritan nuestra intervención apelativa.

Con relación a la prueba pericial, opinamos que las conclusiones sobre los daños en el *Informe preliminar sobre daños y valoración de Farmacia Domínguez* del CPA Soria Rivera deben ser descartadas. Independientemente de los conocimientos especializados y la capacidad del experto, para que sus hallazgos fueran confiables, era esencial tener información suficiente y relevante. Sin embargo, el documento, fechado el 19 de febrero de 2019, no fue actualizado con los datos de las planillas de contribuciones posteriores —aun cuando éstas conformaron evidencia estipulada y admitida en la vista— sino que se limitó a la

---

[124] TPO 20 de abril de 2023, págs. 20 líneas 21-25; 21. Cabe señalar que el TPI realizó advertencias a la apelante sobre su derecho a la no autoincriminación. TPO 6 de marzo de 2023, págs. 119-120.
[125] TPO 20 de abril de 2023, pág. 17 líneas 10-21.
[126] TPO 20 de abril de 2023, pág. 31 líneas 11-18.

información financiera hasta el 2018, justo después del paso del huracán María y a escasos meses del inicio de operaciones de Mi Farmacia Domínguez y Mucho Más. Además, ciertas respuestas del perito al ser confrontado con los datos y la información que desconocía denotaron parcialidad. Estimamos que su testimonio fue impugnado y no constituyó una fuente confiable para que el TPI lo tomara en consideración.

El análisis de la información omitida, que refleja un aumento sostenido en las ventas de la Farmacia Domínguez, es esencial para validar o derrotar la escueta conclusión del experto, en la que estimó los daños al negocio en $104,000.000. Somos del criterio que este hallazgo llano y descarnado adolece de la profundidad requerida para valorar la alegada pérdida de la plusvalía, si alguna, del negocio en común. La plusvalía o "[a]crecentamiento del valor de una cosa por causas extrínsecas a ella"[127] es un activo de considerable valor, pero extremadamente ilíquido al momento de estimar el valor de un negocio.[128] Por su importancia, la protección de estos activos intangibles suele descansar en pactos de confidencialidad y cláusulas de no competencia. En este caso, debe aclararse que el apelado no se obligó con ninguno de estos acuerdos.

Nótese también que, al enterarse, el CPA Soria Rivera restó importancia a la oferta de compra del señor Iván Alemán por $425,000.00 por lo que es evidente que el experto subvaloró el negocio. Dijo: "En las valoraciones yo no lo tomo en consideración [...]".[129] Es medular mencionar, además, que el propio perito reconoció que los datos mostrados en las planillas de contribuciones omitidas fueron capaces de descartar su teoría acerca de la división de la plusvalía y descartó la existencia de daños a DALP.

---

[127] I. Rivera García, *Diccionario de términos jurídicos*, Publishing Corporation, 1985, pág. 207.

[128] Véase el enlace, https://thelawdictionary.org/goodwill y *Black Law Dictionary (Pocket Edition)*, West Group, 1996, pág. 279.

[129] TPO 7 de marzo de 2023, pág. 86 líneas 16-17.

> P. Ejemplo hipotético, si las ventas de ese... de esa entidad hubiesen aumentado anualmente le pregunto si eso no sería un ejemplo donde la inferencia de que cuando aquél se va, el negocio se va a debilitar y se divide la plusvalía que pudo haber generado, pues quedaría contradicho.
>
> R. Es correcto, sería extraño, pero sería... sería contradicho.[130]
>
> .      .      .      .      .      .      .      .
>
> P. [...] Por lo tanto, licenciado, le pregunto si usted estaría de acuerdo conmigo que en caso de que la contabilidad de este negocio refleje que anualmente las ventas aumentaron, no es que su informe no estaba mal hecho, es que los números dieron al traste con los supuestos que usted utilizó basado en su experiencia.
>
> R. Correcto, correcto, [...] la base es el 2017...
>
> P. Sí.
>
> R. [...] si esa base ajustada, que creo que dio un millón seis, si las ventas están por encima de esa base ajustada, **no hubo daño porque no perdieron ventas**.[131] (Énfasis nuestro).

Como cuestión de umbral, en la causa presente, debemos apuntar que la *Sentencia* de divorcio de 2013 acogió las estipulaciones de las partes litigantes, entre las cuales se acordó la disolución de la Farmacia Domínguez. El acuerdo no estaba sujeto a ninguna condición. Según lo reseñado, unilateralmente, la apelante incluyó condiciones como la de permanecer como la farmacéutica regente y que se le satisficieran ciertas reclamaciones dinerarias. Así las cosas, un lustro después del divorcio, todavía no se había dado cumplimiento a la obligación pactada. Entonces, en mayo de 2018, el señor Domínguez Lara estableció Mi Farmacia Domínguez y Mucho Más a través de Latitud 18 Norte, LLC. La apelante aduce que con esta acción el apelado violó su deber de fiducia y lealtad, pero no nos convence. Veamos.

En relación con los componentes presuntamente afectados por la apertura de Mi Farmacia Domínguez y Mucho Más: localización, nombre, clientes, suplidores y empleados, opinamos que la apelante no probó, por preponderancia de la prueba, el daño alegado y meramente descansó en alegaciones conclusivas. En

---

[130] TPO 24 de marzo de 2023, págs. 47 líneas 22-25; 48 líneas 1-4.
[131] TPO 24 de marzo de 2023, págs. 52-54; 55 líneas 1-14.

cuanto a la localización, se sabe que el establecimiento de una facilidad de salud, como lo es una farmacia, está sujeto a la Ley Núm. 2 de 7 de noviembre de 1975, *Ley de Certificados de Necesidad y Conveniencia*, 24 LPRA sec. 334 *et seq.* Consiguientemente, fue el Departamento de Salud el que ponderó de manera afirmativa que existía la necesidad y la conveniencia de establecer Mi Farmacia Domínguez y Mucho Más en el lugar que ubica. No hubo prueba en contrario. En cuanto al nombre, si bien en un principio puede considerarse confuso para los médicos y clientes, lo cierto es que ése es el apellido del apelado y la señora Arocho Pirris no evidenció que existiera un registro de marcas que reconociera una prohibición para el uso del nombre comercial ni una acción administrativa o judicial a esos fines.

Con respecto a los clientes, suplidores y empleados, es imperativo advertir que Latitud 18 Norte, LLC nunca fue parte del pleito. Evidentemente, ello repercutió en que no hubo un descubrimiento de prueba para demostrar cuántos y qué tipo de clientes y suplidores exclusivos de la Farmacia Domínguez se desplazaron a Mi Farmacia Domínguez y Mucho Más debido el uso inadecuado de información privilegiada por parte del apelado. Además, como empleado de la Droguería Betances, el apelado no necesitaba de la Farmacia Domínguez para conocer de primera mano al distribuidor de productos farmacéuticos. Acerca de los empleados, el señor Domínguez Lara testimonió que tres empleadas renunciaron a la Farmacia Domínguez y luego fueron contratadas en Mi Farmacia Domínguez y Mucho Más donde estaban disponibles las plazas de trabajo. Ninguna de estas empleadas prestó testimonio en el juicio. Por su parte, la CPA Colón Rodríguez no es empleada de ninguna de las dos farmacias, sino que rinde sus servicios de contabilidad como contratista independiente y contra ésta no existen alegaciones de faltas éticas en la prestación de sus servicios.

Decididamente, ante la ausencia de prueba tendente a demostrar la veracidad de sus alegaciones, el TPI no incidió al declarar sin lugar la acción derivativa de la apelante.

Consideramos que, si hubo algún menoscabo en el valor de la Farmacia Domínguez, ciertamente, se debió a causas más tangibles que intangibles. En el juicio sí se probó que la Farmacia Domínguez observó una disminución en el flujo de efectivo neto, al menos, entre el 2017 y 2018.[132] El flujo de efectivo neto se refiere a la diferencia entre el dinero que ingresa ("inflow") y el dinero que egresa ("outflow") en una empresa durante un periodo específico.[133] Recuérdese que el manejo de efectivo en contravención a los principios de contabilidad generalmente aceptados le es imputable a la apelante. Sobre este aspecto, precisamente, la CPA Colón Rodríguez testimonió que la Farmacia Domínguez presentaba una debilidad en los controles de gastos, que no satisfacía las prácticas contables. En particular, señaló el renglón de los depósitos y cuadres de ventas. A modo de ejemplo, aludió a la inconsistencia en la información provista por la apelante sobre la cuenta que abrió en 2020 y la cual recibe ingresos mediante el método de pago de ATH Móvil. Con relación al control del efectivo, el TPI determinó probado que:

> 14. La Demandante controla el efectivo generado por las ventas de la Farmacia y utiliza el mismo conforme a su criterio, excluyendo de tales decisiones al Codemandado.
>
> 15. Utilizando el control exclusivo del efectivo generado en [la] Farmacia, la Demandante hizo pagos en efectivo a farmacéuticos por servicios profesionales, provocando que DALP Corporation no les hiciera las retenciones requeridas por ley a estos proveedores de servicios, ni les remitiera las planillas informativas.
>
> .      .      .      .      .      .       .      .
>
> 17. En el Juicio también se estableció que la Demandante abrió una cuenta en FirstBank para manejar pagos de clientes de la Farmacia hechos a través del sistema ATH Móvil, sin proveerle acceso a la cuenta, ni información de

---

[132] Apéndice, pág. 179 y su corrección en la TPO 7 de marzo de 2023, pág. 71 líneas 22-24.
[133] Harvard Business School Online: https://online.hbs.edu/blog/post/cash-flow-vs-profit.

la misma, al Codemandado ni a la CPA de la Corporación, Frances Colón [Rodríguez].[134]

En fin, es razonable concluir que el mecanismo estatutario de la acción derivativa, que sirve para exigir la rendición de cuentas de sus accionistas, se revirtió contra la apelante por el manejo poco riguroso del efectivo que es producto de las ventas de la Farmacia Domínguez. En estos casos, como se sabe, las defensas de equidad, como manos limpias, se activan. Ahora, lo cierto es que este tipo de reclamación no es impedimento para que se realice la disolución de DALP, según acordada por las partes y ordenada por el TPI. *Llorens et al. v. Arribas et al., supra,* pág. 63.

En el caso de autos, DALP tiene dos accionistas, el señor Domínguez Lara y la señora Arocho Pirris. Ambos poseen el cincuenta por ciento (50%) de participación del ente jurídico. Los dueños de DALP se dedican a una empresa en común: la Farmacia Domínguez. Este negocio es una comunidad de intereses, en la que hay un control e interés propietario en conjunto. Es decir, ambos accionistas aportan al logro del fin común: la apelante como farmacéutica regente y el apelado en labores de compras, nómina y otras obligaciones corporativas. Además, ambos accionistas comparten ganancias y pérdidas. Finalmente, es evidente que los litigantes no logran ponerse de acuerdo para dar cumplimiento a la estipulación contractual pactada en el proceso de divorcio. Por tanto, ante la concurrencia de los elementos del Artículo 9.03 de la Ley General de Corporaciones, *supra,* y el hecho incuestionable de que los dos accionistas de DALP solicitaron su disolución, en definitiva, ése es el curso a seguir.

Por último, si bien en una acción derivativa se aspira evitar o remediar el daño o incumplimiento que resulta en el menoscabo de

---

[134] Apéndice, pág. 8.

la corporación, no del accionista promovente ni del promovido, la señora Arocho Pirris alegó sus propios reclamos dinerarios.

Con respecto al salario que la señora Arocho Pirris reclama, en este caso, las partes estipularon que, en 2015, ésta solicitó un aumento de salario y el mismo fue denegado. Nuevamente, el *Informe preliminar sobre daños y valoración de Farmacia Domínguez* del CPA Soria Rivera adolece de la especificidad de principios, métodos e información que confieran confiabilidad a sus conclusiones, que determinaron unos créditos ascendentes a $492,819.00 por dicho concepto; más un crédito de $144,574.00 por el supuesto exceso en el ingreso del señor Domínguez Lara.[135] En torno a este asunto, el TPI encontró probadas las siguientes aseveraciones:

> 9. La Demandante trabaja como Farmacéutica Regente para DALP y supervisa la operación diaria del negocio corporativo, la Farmacia Domínguez (en adelante, la "Farmacia").
>
> 10. Como parte de sus funciones, la Demandante contrata y supervisa los(as) farmacéuticos(as) que cubren turnos en el recetario de la Farmacia, así como el resto del personal de DALP, además de tener a su cargo las ventas de piso, el manejo de inventario y el pago de suplidores, particularmente los que hacen ventas en efectivo a la Farmacia.
>
> 11. Por su parte, se estableció que el Codemandado trabajaba para DALP, teniendo a su cargo las siguientes tareas: revisión de la información provista a ADP, la compañía dedicada al procesamiento de nóminas, para procesar la nómina de DALP; preparación de las planillas fiscales relacionadas; mantenimiento de la relación bancaria entre DALP y el Banco Popular; tramitación de pagos a suplidores de medicamentos de la Farmacia; y, supervisión de la labor de contabilidad de la CPA Frances Colón y el fungir de enlace entre ésta y la operación de la Farmacia para efectuar todas las radicaciones fiscales requeridas.
>
> 12. Por sus respectivas labores, la Demandante y el Codemandado devengan un salario de $64,000.00 anuales cada uno, pagado por DALP Corporation.
>
> 13. Ni la Demandante, ni el Codemandado tienen contrato de empleo escrito con DALP que establezca escalas salariales [...].
>
> .      .      .      .      .      .      .      .

---

[135] Apéndice, pág. 174.

16. Además, la Demandante también paga en efectivo la renta mensual adeudada por DALP a ella, como dueña del inmueble donde ubica y opera la Farmacia.

En este caso, el CPA Soria Rivera sugirió un salario de $55.00 la hora a favor de la apelante, sin precisar sus fuentes, entrevistados ni con cuáles farmacias y jurisdicciones se compararon las compensaciones. Aun si concluyéramos que la cuantía podría resultar razonable para un farmacéutico de una farmacia de la comunidad en Puerto Rico, parece incompatible que, en el mismo *Informe*, el perito refrendó que DALP asumiera un gasto recurrente sustancial, como el incremento salarial solicitado por la apelante. Ello así, mientras a la vez concluía que la corporación observaba una disminución en el flujo de efectivo neto debido a un aumento en los gastos.

Lo cierto en este caso es que, mediante un contrato verbal, los accionistas de DALP, cuya participación es igualitaria y ejercen funciones en el interés propietario conjunto, acordaron un salario de $64,000.00 para cada uno. Por ello, coincidimos con el TPI al determinar que:

36. En cuanto al reclamo de la Demandante que su compensación como empleada de la Farmacia era menor a lo razonable o reconocido en el mercado, el CPA Soria [Rivera] [...] admitió que, como regla general, en la empresa privada la gerencia de una entidad es la que determina cual será la compensación de sus funcionarios y empleados.[136]

Cabe mencionar también que, al fijar la compensación de la apelante, se tomó en consideración que DALP pagaría a la señora Arocho Pirris un canon de arrendamiento de $2,500.00 por el local de la Farmacia Domínguez. Un espacio que la apelante unilateralmente redujo, sin ajustar el pago de renta, en perjuicio de la corporación. Así lo testificó el apelado:

P. A preguntas de la compañera usted señaló que el salario de ambos usted lo determinó y la señora Emma lo aceptó. Le pregunto, ¿anterior a este pleito la señora Arocho le

---

[136] Apéndice, pág. 12; TPO 24 de marzo de 2023, págs. 61-63.

había pedido a usted que se cambiara el salario de alguna otra manera?

R. No, no me lo había pedido, bueno, había ordena... me había pedido que hiciera cambios al salario pero no de esa manera. De hecho, **como parte del acuerdo original cuando se estipularon los dos sueldos, inicialmente, los 2,300 dólares, eventualmente era porque ella recibe una renta de 2,500 dólares que se había estipulado** para la... el... el edificio que sí se le había dicho, pues, te vamos poner 2,500 dólares como renta del edificio.

P. ¿Y esa renta actualmente...

R. **Que antes no se pagaba eso**.

P. ¿Y actualmente esa renta cómo se le paga a doña Emma?

R. Bueno, ella redujo el espacio que originalmente pagaba esa renta en la farmacia. Yo le solicité a ella entonces que se disminuyera a 2,000 dólares en vez de 2,500 dólares, ella no lo aceptó y **se lo coge ella directamente del *cash***.

P. O sea, lo que usted nos dice es que ella ha tomado la determinación que del efectivo que ella maneja **ella se sigue pagando 500 pesos adicionales de renta**.

R. Sí, porque ella quitó espacio que usaba de almacenamiento en el local que se le había rentado por 2,500 dólares. **Arbitrariamente lo redujo y yo le dije: "Eso no debe ser entonces el canon de pago de 2,500 dólares, deberían ser 2,000 dólares por lo menos", y ella no lo aceptó**. No hay contrato de arrendamiento, no hay contrato específico de arrendamiento con la corporación, pero eso era lo que habíamos estipulado junto con lo del sueldo en aquel entonces.[137] (Énfasis nuestro).

Así, pues, justipreciada la totalidad de la prueba oral y pericial, resolvemos que la apelante no es acreedora de un crédito por concepto de salarios. El TPI no incidió al concluir que, toda vez que la fijación de la compensación de un empleado y sus condiciones de empleo es un asunto que le compete a la gerencia de la corporación, la apelante no cumplió con su carga probatoria.[138]

**B.**

En los errores tercero y cuarto, intrínsecamente vinculados por lo que se discutirán unidos, la señora Arocho Pirris aduce que

---

[137] TPO 24 de marzo de 2023, págs. 185 líneas 17-25; 186.
[138] El señor Domínguez Lara expuso en su *Alegato* que, el 20 de diciembre de 2023, presentó ante el TPI un escrito intitulado *Moción Informativa y en Solicitud de Referido a la Oficina del Fiscal de Distrito, al Departamento de Hacienda y Nombramiento de un Síndico*. Allí informó haber obtenido evidencia que demostraba que la señora Arocho Pirris se aumentó el salario a razón de $3,000.00 mensuales, para lo que utilizó el efectivo generado por la Farmacia Domínguez. Véase, *Alegato de la Parte Apelada*, pág. 16.

el TPI erró al conceder al apelado un remedio que supuestamente renunció en la *Reconvención Enmendada*. Es decir, que el apelado no reprodujo en el documento enmendado su reclamo del pago de $104,000.00 ni adoptó por referencia lo alegado en la *Reconvención* original. Sin embargo, del *Informe enmendado de conferencia con antelación al juicio* se desprende claramente que ambos litigantes sometieron ante la consideración del TPI, entre otras, las siguientes controversias: Demandante — "La procedencia o no del reclamo establecido en la reconvención de $104,000[.00], que reclama el demandado". Demandado — "Establecer la deuda de $104,000.00 de la demandante a favor del demandado, en cumplimiento con la Liquidación de Bienes Gananciales".[139] De hecho, el TPI expresó que este documento enmendado contenía las teorías expresadas por ambas partes, quienes lo suscribieron en conjunto, y a base de dicho *Informe* es que se iba a conducir el litigio.[140] Por ende, consideramos que el planteamiento es inmeritorio.

Ahora, la apelante indica que, de proceder el pago, al señor Domínguez Lara sólo le correspondería la suma de $52,000.00. Esto, porque ambos eran dueños en partes iguales del DBA Farmacia Domínguez. Tiene razón.

En su *Reconvención*, el apelado alegó lo siguiente:

5. Antes de comenzar la operación mediante el ente corporativo, las partes por mutuo acuerdo cerraron la cuenta de banco del negocio cuando fungía como un DBA. La demandante retuvo $104,000.00 del efectivo remanente del negocio. **Al día de hoy la demandante le adeuda la misma cantidad al aquí demandado y por medio de esta reconvención le solicita dicha cantidad que le adeuda, un total de $104.000.00**. La cantidad adeudada es del remante del negocio cuando fungía como un DBA.

.      .      .      .      .      .      .      .

7. En común acuerdo con el demandante decidieron cerrar la cuenta de DBA Farmacia Domínguez y dividir en partes iguales y entre las dos partes los activos existentes. A partir de ese momento se comenzó a utilizar la nueva

---

[139] Apéndice, pág. 124.
[140] TPO 7 de marzo de 2023, pág. 52 líneas 12-20.

cuenta de DALP Corp. para la administración contable de la Farmacia Domínguez. [...]

8. La parte aquí compareciente solicita que este Tribunal ordene a la demandante el pago de los $104,000.00 adeudados al demandado como parte de la liquidación de bienes de bienes gananciales existente entre las partes y que no ha sido liquidado; [...][141] (Énfasis en el original).

Con relación a los $104,000.00 en controversia, reproducimos las declaraciones atinentes de la señora Arocho Pirris:

P. Doña Emma, mire a ver si es o no cierto que usted había... tiene retenidos 104,000 dólares, esa es la cifra específica, **104,000 dólares de efectivo que estaban pendientes de dividirse entre las partes porque eran del producto de la corporación** cuando la corporación se vendiera, sí o no.

R. No.

P. ¿No?

R. Porque ese dinero no...

P. No, no me lo tiene que explicar...

R. Okay.

P. ...yo le voy a hacer las preguntas ahora.

R. Okay.

P. Antes de mostrarle la deposición, doña Emma, le pregunto, ¿esa cifra de 104,000 pesos a usted le suena que la ha escuchado antes en una deposición o en el caso?

R. Sí, se habló de ella en la deposición.

P. Sí. Y le pregunto si esos 104,00 pesos es una cifra en... de dinero en efectivo.

R. Sí, **es una cifra de dinero en efectivo**.

P. **Y le pregunto si es o no cierto que usted declaró que esos 104,000 dólares era un dinero que estaba pendiente de liquidarse**.

R. **De liquidarse del DBA**.

P. De liquidarse, ¿verdad que sí? Y era producto de la farmacia, sí o no, de las ventas de la farmacia, no es que se pegaron en la Loto, no es que jugaron en los caballos, **es producto de las ventas de la farmacia, sí o no**.

R. **Sí**.

P. **Sí. Y esos 104,000 pesos usted los tiene, sí o no**.

R. **Sí, están en... en... están administrados por mí**.

P. Administrados por usted.

R. **¡Unjú!, retenidos**, ¿verdad?[142] (Énfasis nuestro).

Por su parte, el señor Domínguez Lara corroboró que la suma estaba pendiente de liquidar.[143]

---

[141] Apéndice, págs. 37-38.
[142] TPO 6 de marzo de 2023, pág. 138; 139 líneas 1-13.
[143] TPO 24 de marzo de 2023, pág. 130 líneas 6-11.

P. Le pregunto, señor Domínguez, en qué concepto son esos 104,000 dólares, específicamente la pregunta es, usted alega, ¿verdad?, que tiene un crédito de unos 104,000, ¿sobre qué conceptos es ese dinero?

R. **Es un dinero de la venta de la otra, del DBA**, cuando...

P. De la...

R. ... **se hizo la división de bienes gananciales**.

P. ¿Y ese dinero dónde estaba?

R. Estaba en la casa.

P. ¿Y ese dinero era de qué forma?

R. **De las ventas de la farmacia**.[144] (Énfasis nuestro).

En suma, el apelado dijo que este dinero en efectivo, producto de las ventas de la Farmacia Domínguez cuando operaba como DBA, se encontraba en poder de la apelante y estaba sujeto a liquidación.[145] Según el declarante, la señora Arocho Pirris indicó que lo iba a entregar cuando se vendiera el negocio.[146]

En torno a la cuestión, el TPI consignó el siguiente enunciado fáctico:

38. En lo que concierne el reclamo de pago del Codemandado de los $104,000.00 correspondientes a su participación en la operación de la Farmacia Domínguez antes que el negocio fuera transferido a la Corporación DALP, que fueron retenidos por la Demandante, [é]sta admitió que mantiene bajo su control la indicada suma de $104,000.00 producto del resultado de las operaciones de la Farmacia y que esperaba por el resultado del pleito para retenerlos o entregarlos.

Es forzoso concluir que el TPI cometió un error manifiesto al determinar que la suma reclamada en la *Reconvención* correspondía solamente a la participación del apelado de la Farmacia Domínguez cuando operaba como un DBA y, por ende, conceder la totalidad de los $104,000.00 a favor del señor Domínguez Lara. Una revisión no prevenida de las alegaciones, reclamaciones y las declaraciones vertidas en juicio nos lleva a colegir que ambos litigantes son acreedores en partes iguales de la suma de $104,000.00. Dicha cuantía constituye un remanente del DBA Farmacia Domínguez,

---

[144] TPO 24 de marzo de 2023, pág. 153 líneas 9-21.
[145] TPO 24 de marzo de 2023, págs. 154 líneas 7-15; 155 línea 2.
[146] TPO 24 de marzo de 2023, pág. 187 líneas 1-8.

para el tiempo en que todavía estaba vigente la Sociedad Legal de Bienes Gananciales que las partes conformaron. La apelante admitió que retenía la suma dineraria y el apelado reclamó su liquidación. A ambos, como dueños en partes iguales del DBA Farmacia Domínguez y componentes de la comunidad postganancial, les corresponde la mitad del remanente producto de las ventas del negocio. En consecuencia, le asiste la razón a la apelante al señalar que el TPI incidió al conceder la cuantía completa únicamente al señor Domínguez Lara, quien realmente es acreedor de la mitad del monto retenido por la señora Arocho Pirris, esto es, $52,000.00.

## IV.

Por los fundamentos expuestos, modificamos la *Sentencia* apelada, a los efectos de ordenar a la Sra. Emma Arocho Pirris a pagar al Sr. Benigno Domínguez Lara la suma de $52,000.00; así modificada, se confirma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones